IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADMIRAL INSURANCE COMPANY,        )
                                  )
        Plaintiff,                )
                                  )
                                  )
                                  )
    v.                            )  No. 19 C 3468
                                  )
                                  )
ALEXANDRIA ANDERSON, ALEXANDRIA   )
CLEMONS, CARIANA CHAMBERS,        )
RAVEN SMITH, BIANCA VALDEZ, AVA   )
THOMPSON GREENWELL, ASHANTI       )
MADLOCK-HENDERSON, and FELICIA    )
HANKINS, personal                 )
representative of the estate of   )
JORDAN HANKINS.                   )
                                  )
        Defendants.

Memorandum Opinion and Order

This insurance dispute stems from the tragic suicide of
Northwestern University student and Alpha Kappa Alpha sorority
pledge Jordan Hankins in January of 2017. In the wake of Jordan's
death, her mother Felicia filed a wrongful death action against
the national sorority, two of its chapters, and a number of
individuals including those named as defendants in this case.
Felicia's sixteen count complaint, which asserts various theories
of liability for Jordan's death, is currently proceeding in this
district before Judge Chang. *See Felicia Hankins, Personal*

*Representative of the Estate of Jordan Hankins v. Alpha Kappa Alpha
Sorority, Inc., et* al., 19 CV 147 (N.D. Ill.).

At least two of the individuals sued in the underlying action
as members and agents of the sorority — Ashanti Madlock-Henderson
and Ava Thompson Greenwell — provided notice of the suit to
plaintiff Admiral Insurance Company and sought coverage pursuant
to the commercial general liability policy Admiral issued to the
sorority (the "Admiral Policy").[1] These defendants also tendered
the suit to the issuers of their respective homeowner's insurance
policies. Admiral disclaimed any duty to defend or indemnify the
individual defendants against Felicia's claims and filed the
instant suit for a declaration to that effect. Liberty Mutual
Insurance Corporation has been defending Madlock-Henderson in the
underlying suit, subject to a reservation of rights, pursuant to
a homeowner's insurance policy it issued to Madlock-Henderson's
husband, and it has intervened in this action with a counterclaim
against Admiral. State Farm Fire and Casualty has undertaken
Thompson Greenwell's defense, also under a reservation of rights,

---

[1] In her motion for judgment on the pleadings, Bianca Valdez states
that she, too, tendered her defense to Admiral and sought coverage
under the Admiral Policy. Unlike Madlock-Henderson and Thompson
Greenwell, however, Valdez did not file a counterclaim in this
case, and none of the pleadings on file refers to Valdez's tender.
Nevertheless, Admiral does not appear to dispute that Valdez
provided timely notice of her claim. The record also does not
reveal whether Admiral is defending the sorority in the underlying
action.

2

pursuant to her homeowner's policy. State Farm is not a party to this action. Madlock-Henderson and Thompson Greenwell have also filed joint counterclaims against Admiral.

Admiral's declaratory complaint asserts six grounds for its refusal to defend the underlying action. In Count I, it claims that defendants are not "insureds" under the Admiral Policy in relation to the underlying lawsuit. Count II asserts that the Admiral Policy's "hazing exclusion" bars coverage. In Count III, Admiral claims that there has been no "occurrence" for coverage purposes. Counts IV and V invoke exclusions for "expected or intended injury" and for "assault and/or battery," respectively. And Count VI invokes the "other insurance" clause of the Admiral Policy to claim that Admiral has no duty to defend any defendant to the extent she is covered by another valid and collectible insurance policy.

In its counterclaims, Liberty Mutual seeks a declaration that Admiral has a duty to defend its mutual insured, Madlock-Henderson, in the underlying case, and that Admiral's policy is primary to Liberty Mutual's own policy, which it claims is excess with respect to any losses arising out of Felicia's claims. In addition, Liberty Mutual claims equitable subrogation/equitable contribution from Admiral to recover the costs and expenses it has incurred in defending Madlock-Henderson in the underlying suit. Thompson

Greenwell and Madlock-Henderson similarly counterclaim for a declaration of Admiral's duty to defend as well as for breach of contract.

Four motions are currently pending, all of which revolve around the central issue of whether Admiral has a duty to defend defendants in the underlying suit. Admiral and Liberty Mutual raise this issue in cross-motions for judgment on the pleadings, which also address the secondary issue of which of these insurers' obligations, if any, are primary and which are excess with respect to the other. Defendant Bianca Valdez, an individual sued in the underlying suit as a member and agent of the sorority, also moves for judgment on the pleadings as to Admiral's duty to defend. And Madlock-Henderson and Thompson Greenwell jointly move for partial summary judgment on Admiral's duty to defend claims and their corresponding counterclaims. For the reasons that follow, I conclude that Admiral does have a duty under the Admiral Policy to defend defendants and resolve the pending motions as set forth below.

## I. The Underlying Lawsuit

Felicia Hankins's operative complaint alleges that in October of 2016, Jordan attended a "rush" event hosted by the sorority's undergraduate chapter, Gamma Chi, under the direction of its graduate chapter, Delta Chi Omega. Underlying Complaint ("UC"),

4

Compl. Exh. A at ¶¶ 4, 7, 57. Greenwell Thompson and Madlock-Henderson served as the graduate and assistant graduate advisors to Gamma Chi during the relevant time periods, were members of Delta Chi Omega, and acted as agents of the sorority with respect to member initiation. *Id.* at ¶¶ 29, 31, 153. Bianca Valdez was a sorority member and also acted as an agent of the sorority with respect to initiation. *Id.* at ¶¶ 26-27, 153.

The underlying complaint states that Jordan completed the sorority membership intake process in October and November of 2016. *Id.* at ¶ 60. On November 20, 2016, she was advised by members of the sorority that for her membership to be accepted, she had to agree to a post-initiation pledge process. *Id.* at ¶¶ 63-64. She was then subjected to "several instances of severe hazing." *Id.* at ¶ 66. Jordan allegedly "was subjected to physical abuse including paddling, verbal abuse, mental abuse, financial exploitation, sleep deprivation, items being thrown and dumped on her, and other forms of hazing intended to humiliate and demean her." *Id.* at ¶ 67. The underlying complaint asserts that Jordan communicated to sorority members, including the individually named defendants, that these actions triggered her PTSD and caused her to have suicidal thoughts and develop a plan for suicide. Jordan died by suicide in her dorm room on January 7, 2017. *Id.* at ¶ 70.

5

Counts XI-XVI of the UC raise six theories of liability against the individual defendants: Counts XI and XII claim wrongful death and survival damages based on negligence. Counts XIII and XIV claim wrongful death and survival damages based on intentional infliction of emotional distress. And Counts XV and XVI claim wrongful death and survival damages based on negligent infliction of emotional distress. *Id*. at ¶¶ 210-253. The paragraphs in support of the negligence counts allege, *inter alia*, that the individual defendants:

> (a) Planned and promoted multiple hazing activities, in which Gamma Chi initiates, including Jordan Hankins, as a condition to membership in the sorority, had to be subjected to various forms of hazing including physical abuse, mental abuse, verbal abuse, financial exploitation, and sleep deprivation;
>
> (b) Required Jordan Hankins, as a condition to membership in the sorority, to call sorority members at specific times to be subjected to verbal abuse;
>
> (c) Required Jordan Hankins, as a condition to membership in the sorority, to subject herself to physical abuse;
>
> (d) Failed to seek medical attention for Jordan Hankins when she advised that she was "mentally unstable" and having suicidal thoughts;
>
> (e) Failed to report the hazing activities to agents, officers, and/or members of the sorority; and
>
> (f) were otherwise careless and negligent.

*Id*. at ¶¶ 211, 216.

In allegations supporting the claim of negligent infliction of emotional distress, the UC pleads that defendants breached their duty of reasonable care "to protect Hankins from the dangers of hazing" when they hazed her "individually, and as agents, officers, and member of AKA Sorority." *Id.* at ¶¶ 237, 246. "Illustrations of said hazing, cited by way of example but not limitation, are as follows":

    (a) Verbal abuse;

    (b) Physical abuse;

    (c) Emotional abuse;

    (d) Mental abuse; and

    (e) Financial exploitation.

*Id.* at ¶ 230.

## II.  Legal Standard

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings after the complaint and answer have been filed. Fed. R. Civ. P. 12(c). "When a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020). Although this standard is the same as the one that applies to motions to dismiss under Rule

12(b)(6), *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020), "[w]hen the movant seeks to 'dispose of the case on the basis of the underlying substantive merits... the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings.'" *U.S. Specialty Ins. Co. v. Vill. of Melrose Park*, 455 F. Supp. 3d 681, 687 (N.D. Ill. 2020) (quoting *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993)) (ellipses in *Melrose Park*). As that is the case here, I apply the same standard to each of the pending motions, except that I may consider undisputed facts outside of the pleadings and their attachments to resolve Madlock-Henderson's and Thompson Greenwell's summary judgment motion.

Under Illinois law, which governs the substance of the parties' dispute, insurance policies are construed in accordance with ordinary rules of contract interpretation. *Hobbs v. Hartford Ins. Co. of the Midwest*, 214 823 N.E.2d 561, 564 (2005). If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning unless doing so would violate public policy. *Berg v. New York Life Ins. Co.*, 831 F.3d 426, 429 (7th Cir. 2016). Any ambiguities in the policy, however, must be construed liberally in favor of coverage, and any provisions that limit coverage must be construed narrowly. *DeSaga v. W. Bend Mut. Ins. Co.*, 910 N.E.2d 159, 164 (Ill. App. Ct. 2009).

An insurer's duty to defend is broader than its duty to indemnify. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (1992). To determine whether an insurer has a duty to defend, a court compares the allegations of the underlying complaint with the language of the policy. *Id.* If the underlying complaint "alleges facts within or potentially within policy coverage," the insurer is obligated to defend, "even if the allegations are groundless, false or fraudulent." *General Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (2005). Moreover, if the underlying complaint asserts multiple theories of recovery, the insurer must defend if even one is potentially within the policy's coverage, *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991). *See also Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1015 n. 2 (Ill. 2010) (if the insurer has a duty to defend against any count in the underlying complaint, it must defend against all counts).

### III. Admiral's Declaratory Claims

#### Count I: "An Insured"

Admiral's first basis for refusing to defend is that defendants are not "insureds" under the policy and thus have no coverage in relation to the underlying suit. The named insured under the Admiral Policy is Alpha Kappa Alpha Sorority, Inc. *See* Compl. Exh. B. An endorsement titled "Who Is An Insured Amendatory

9

Endorsement," provides that "an insured" also includes "Individual Officers, Directors, Trustees, Partners, Coordinators, Custodians, Committee Members, Council Members, Volunteers, Faculty Advisors and [Sorority] Members and Candidates for Membership who are in financial good standing with the Named Insured...but only while such persons are performing duties related to the conduct of the Named Insured's business. *Id.*, Form AI 08 76 02 03. Admiral argues that defendants fall outside the scope of this definition for two reasons: first, that they cannot have been "performing duties related to the conduct of [the sorority's] business" when they allegedly hazed Jordan because the sorority prohibits hazing; and second, that some defendants may not have been in financial good standing. Neither argument relieves it of the duty to defend.

To establish an insurer's duty to defend, the initial burden is on the insured to prove that a claim falls within the coverage of the Policy. *OneBeacon Am. Ins. Co. v. City of Zion*, 119 F. Supp. 3d 821, 832 (N.D. Ill. 2015). Defendants clear this hurdle with respect to their status as insureds, pointing to the UC's allegations that they were members of the sorority and acted in their capacity as its agents in conducting sorority business, namely "Membership Intake." Compl. at ¶¶ 198, 199, 77. Admiral argues that defendants cannot be deemed to have been conducting

10

sorority business because they allegedly acted in violation of the sorority's policies. This argument is unavailing.

Admiral cites *Royal Surplus Lines Ins. Co. v. Cotton States Mut. Ins. Co.*, 67 852 N.E.2d 1143 (Table), 2006 WL 2422769 (Mass. App. Ct. 2006), in which a Massachusetts appellate court affirmed summary judgment in favor of an insurer that refused to defend a fraternity officer against claims arising out of a hazing event he organized in violation of fraternity policy. The court found that the officer acted "intentionally[] outside the scope of his duties as an officer of the local fraternity" and concluded on that basis that the officer was not "acting within the scope of [his] duties on behalf of the named insured" as required to satisfy the policy's definition of "an additional insured." 2006 WL 2422769, at *4. But there are several salient distinctions between that case and this one. First, the Admiral Policy's definition of "an insured" is broader than the definition at issue in *Royal Surplus*, as it requires that members be performing duties "related to the conduct of [sorority] business," not duties "on behalf of" the sorority. *Compare* Merriam-Webster, https://www.merriam-webster.com/dictionary/relate%20to (defining "relate to" as, *inter alia,* "to be connected with (someone or something)") (last accessed March 26, 2021) *with* https://www.merriam-webster.com/dictionary/on%20behalf) (defining "on behalf" as "as

11

a representative of someone") (last accessed March 26, 2021). Second, the UC alleges expressly that defendants acted "within their authority" as agents and members of their sorority, Compl. at ¶ 238, not "intentionally outside the scope" of their duties, as in *Royal Surplus*. For these reasons, *Royal Surplus* does not support Admiral's refusal to defend against the UC's allegations pursuant to the policy provisions at issue here.

Moreover, while the UC describes intentional conduct alleged to violate sorority policy, it does not attribute any specific such conduct to any individual defendant. Instead, it offers "illustrations" of such conduct, "cited by way of example," that "defendants" allegedly committed. Compl. at ¶¶ 222, 230. Meanwhile, the UC also asserts liability based on defendants' negligent conduct, which includes "failing to seek medical attention" for Jordan after she told them she was experiencing suicidal ideations and "failing to report hazing activities" to other sorority agents. Taking all its allegations together, the UC suggests, and does not foreclose the possibility, that defendants may be liable for Jordan's death as "insureds" under the Admiral Policy, i.e., as sorority members and agents who negligently performed duties related to the conduct of sorority business. Accordingly, Admiral cannot refuse to defend. *See Scottsdale Ins. Co.* 972 F.3d at 920.

With respect to the issue of financial good standing, Admiral observes correctly that the UC is silent on this issue but argues erroneously that it must do so for defendants to carry their burden of establishing potential coverage. "The complaint need not allege or use language affirmatively bringing the claims within the scope of the policy, as the question of coverage should not hinge exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action." *Axiom Ins. Managers, LLC v. Capitol Specialty Ins. Corp.*, 876 F. Supp. 2d 1005, 1012 (N.D. Ill. 2012). Indeed, so long as the UC's allegations suggest that the individual defendants are within a category of individuals the Admiral Policy defines as "an insured" and do not foreclose the possibility that they are within the scope of that definition, Admiral must defend. *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020) ("An insurer must defend when the underlying allegations do not foreclose coverage") (internal quotation marks and citation omitted). Admiral's pleading "on information and belief" that some defendants may not be in financial good standing does not compel a contrary conclusion.

## Count II: Hazing Exclusion

Admiral's next argument is that the loss alleged in the underlying action is "bodily injury...arising out of hazing," and

as such is excluded by a provision captioned "Hazing, Sexual of Physical Abuse or Molestation," which states:

> It is agreed this insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of hazing, sexual abuse, physical abuse or molestation committed by any insured. This exclusion applies only to insureds who participate in or direct others to participate in the hazing, sexual abuse, physical abuse, or molestation.

Compl. Exh. B at AD 06 53 01 03. One of the theories presented in the UC is that defendants are liable for Jordan's death based on their intentional hazing, which they engaged in despite knowledge that the hazing "was triggering [Jordan's] PTSD, causing severe anxiety and depression and that she was having suicidal thoughts." UC, Compl. Exh. A at ¶¶ 69, 225. The conduct alleged in this count appears on its face to fall exclusively within the hazing exclusion, and indeed, none of the defendants argues otherwise. Where the parties' views diverge is on the question of whether the counts pled as negligence claims potentially assert covered losses, or whether they, too, allege injuries exclusively within the scope of the hazing exclusion. While the question is a close one, I conclude that as the UC's negligence claims are pled, they potentially seek recovery for covered losses.

This conclusion is not based simply on how the counts in the UC are captioned. Indeed, as Admiral correctly observes, "[w]hat is important is not the legal label that the plaintiff attaches to

14

the defendant's (that is, the insured's) conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers." *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 745 (7th Cir. 2001) (citation omitted); *Ill. Cas. Co. v. West Dundee China Palace Rest., Inc.*, 49 N.E.3d 420, 426 (Ill. App. Ct. 2015) ("little weight" is given to legal labels). And as the parties' cited authorities reflect, courts have come out differently on the question of whether claims asserting negligent conduct such as the failure to seek medical assistance are independent from — and thus not excluded by — policy provisions excluding coverage for the injuries that necessitated medical intervention. *See, e.g., Skolnik v. Allied Prop. & Cas. Ins. Co.*, 45 N.E.3d 1161, 1168, 1167 (Ill. App. Ct. 2015) (because "negligence counts allege acts that have the potential of recovery under the insurance policies," allegations claiming excluded losses did not "extinguish" insurer's duty to defend); *Liberty Corp. Capital, Ltd. v. California Tau Chapter of Sigma Alpha Epsilon Fraternity*, Case No. 11-cv-02626, 2012 WL 12877181 (C.D. Cal. Dec. 3, 2012) (alleged negligence caused potentially covered losses independent from excluded loss, so insurer had duty to defend); *cf. State Farm Fire & Cas. Co. v. Young*, 968 N.E.2d 759, 766 (Ill. App. Ct. 2012) (where alleged injuries "were not the

result of an accident under any definition for that term recognized in our jurisprudence," negligence claims did not shield losses from provisions excluding losses caused by insured's intentional conduct); *Allstate Ins. Co. v. Smiley*, 659 N.E.2d 1345, 1351 (Ill. App. Ct. 1995) (no coverage for loss that "originated or came about from" excluded activities, regardless of how the insured characterized the cause of the injury). Ultimately, however, I need not delve into the weeds of these cases, nor into the parties' sometimes-strained efforts to distinguish those that are unfavorable to them while emphasizing the shared features of those that support them. In the end, the way the underlying claims are pled in this case raises the possibility that any one of the individual defendants may be held liable for Jordan's death without proof that she engaged in conduct within the scope of the hazing exclusion. That is enough to establish Admiral's duty to defend.

As noted above, the UC's description of the mistreatment to which Jordan was subjected does not attribute specific conduct to any individual defendant. That is acceptable under Rule 8, *see Access Servs. of N. Illinois v. Capitol Administrators, Inc.*, No. 3:19-CV-50050, 2021 WL 780489, at *7 (N.D. Ill. Mar. 1, 2021) (citing cases), and discovery will presumably clarify the role of each defendant, if any, in the hazing the UC alleges. For the time being, however, the most that can be said of any defendant's

conduct is that she allegedly committed "one or more" acts or omissions claimed to have caused Jordan's death, some of which — such as the failure to seek medical care for Jordan after learning that Jordan was planning suicide — does not clearly fall within the scope of the hazing exclusion.

It bears noting in this connection that the Admiral Policy does not define "hazing." While this omission does not, contrary to Liberty Mutual's suggestion, render the exclusion ambiguous per se, *Geschke v. Air Force Ass'n*, 425 F.3d 337, 343 (7th Cir. 2005) (under Illinois law, "[a] policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning") (original alteration), it means that the term is presumed to have its "ordinary-language meaning." *Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co.*, 165 F.3d 1157, 1160 (7th Cir. 1999). Yet, despite its insistence that the term "hazing" is unambiguous as used in the policy, Admiral nowhere asserts the "ordinary-language meaning" of the term. Admiral does offer the UC's allegation that the sorority defines hazing as:

> acts that include but are not limited to: (1) Physical acts, such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s); (2) behavior which is directed against any individual(s) for the purpose of causing shame, abuse, insult, humiliation, intimidation or disgrace; and (3) a variety of prohibited practices including, but not limited to, "underground hazing," "financial hazing," "pre-

17

> pledging," "post-pledging" or "post-initiation pledging."

Compl. Exh. A at ¶ 40. On its face, however, this definition does not include defendants' alleged failure to seek medical help or to report hazing, both of which omissions are among the grounds the UC identifies as giving rise to defendants' liability.

For these reasons, it is not clear from the face of the underlying complaint that Jordan's death was caused solely by a proximate cause excluded by the Admiral Policy's hazing exclusion. *See United States Fidelity & Guaranty Co. v. State Farm Mutual Automobile Insurance Co*. 504 N.E.2d 123, 125 (Ill. App. Ct. 1987) ("If a proximate cause of an injury is within the included coverage of an insurance policy, the included coverage is not voided merely because an additional proximate cause of the injury is a cause which is excluded under the policy."). Accordingly, Admiral has a duty to defend.

<u>Count III: "Occurrence"</u>

Admiral's third ground for refusing to defend defendants claims that the UC does not allege losses resulting from an "occurrence" as defined in the Admiral Policy. It relies on the following policy provisions:

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. . ..

b. This insurance applies to "bodily injury" and "property damage" only if

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" . . .

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from "bodily injury" . . .. an accident, including continuous or repeated exposure to substantially the same general harmful conditions. . ..

**SECTION V — DEFINITIONS**

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Compl. Exh. B at 1, 14.

Admiral observes that Illinois courts also interpret "occurrence" to mean an "accident" and contends that the UC's allegations that defendants intentionally hazed Jordan place its claims outside the scope of an "occurrence" under the Admiral Policy. Pl.'s Mem. (DN 112) at 12 (citing *Atlantic Mut. Ins. Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 561 (1st Dist. 2000) ("an occurrence which is defined as an accident involves the consideration of whether the injury was

expected or intended from the standpoint of the insured"), and *Stoneridge Development Co., Inc. v. Essex Ins. Co.*, 382 Ill. App. 3d 731, 749-50 (2d Dist. 2008)). Even assuming, however, that this exclusion precludes defendants from obtaining indemnification for losses caused by the foreseeable consequences of their intentional conduct, Admiral's argument again ignores the possibility that the defendants may be liable in the underlying action based on their alleged negligence. "What [Admiral] must remember is that its duty to defend arises even if only one theory is within the potential coverage of the policy or the allegations fall within at least one of the categories of wrongdoing alleged." *OneBeacon* 119 F. Supp. 3d at 838. As discussed above, because the UC does not attribute specific conduct to any individual, the UC's allegations raise the possibility that any one of the defendants could be held liable for Jordan's death based entirely on failure to seek medical attention or to report hazing to sorority authorities, even absent any evidence of intentional misconduct. Under these circumstances, a jury could conclude that Jordan's death was the result of "bodily injury" caused by an "occurrence," i.e., an "accident," and attribute liability to one or more defendants without finding that

they intended or expected her suicide. Admiral's cited authorities do not compel a contrary conclusion.[2]

### Counts IV and V: "Expected or Intended Injury" and "Assault and/or Battery"

Admiral's declaratory complaint asserts the following exclusions in the Admiral Policy as grounds for refusing to defend or indemnify defendants:

> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of any act of assault and/or battery by any insured. This exclusion applies only to insureds who participate in or direct others to participate in the assault and/or battery.

Compl. Exh. B, Form AD 06 52 01 03, and

> [t]his insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of any act of assault and/or battery by any insured. This exclusion applies only to insureds who participate in or direct others to participate in the assault and/or battery.

Compl. Exh. B, Form AD 06 52 01 03.

---

[2] In *American Academy of Orthopaedic Surgeons*, 734 N.E.2d at 60, the court held that a policy exclusion for intentional acts applied notwithstanding allegations of the insured's negligence by examining "*the actual conduct* of the insured alleged in the underlying complaint." (Emphasis added) Here, the underlying complaint does not specify the "actual conduct" of any individual and raises the possibility that any one of them could be liable based purely on her negligence. *Stoneridge* involved underlying allegations of breach of contract rather than negligence, a distinction the court indicated was material to its outcome. *See* 888 N.E. 2d at 651.

In their motions for judgment on the pleadings, both Liberty Mutual and Valdez argue that these exclusions do not excuse Admiral from its duty to defend for substantially the reasons discussed above, i.e., that notwithstanding the possibility that losses resulting from intentional or assaultive/battering conduct alleged in the UC may be excluded from coverage, it is not clear from the face of the UC that its allegations fail to state facts that bring the case within, or potentially within, the policy's coverage. Valdez adds that in Illinois, because a suicide is unforeseeable as a matter of law, *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015), it remains an "accident" regardless of the UC's allegations of defendants' intentional conduct. Admiral does not respond to these arguments, entitling Valdez and Liberty Mutual to judgment on the pleadings that these exclusions do not excuse Admiral from its duty to defend.

Admiral's only discussion of these exclusions is in the portion of its Omnibus Response/Reply to the summary judgment motion by Madlock-Henderson and Thompson Greenwell. Admiral complains that these defendants "conclude without supporting evidence that these two exclusions do not apply," but Admiral has it backwards. Under Illinois law, "[t]he insurer has the burden of proving that an exclusion applies." *Axiom Ins. Managers* 876 F. Supp. 2d at 1008 (citing *Santa's Best Craft, LLC v. St. Paul Fire*

22

& *Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010)). Having satisfied their initial burden to show that the UC raises at least one claim falling within, or potentially within, the scope of coverage under the Admiral Policy, it is Admiral that must come forward with evidence to suggest that all claims in the UC are excluded.

In further response to the summary judgment motion on this issue, Admiral insists that it is entitled to discovery to ascertain the roles of the respective defendants in the hazing alleged in the UC. That is certainly true. And indeed, discovery may reveal that defendants engaged in excluded conduct. Further, if that excluded conduct is determined to be the sole proximate cause of the losses alleged in the UC, then defendants will not be entitled to indemnity. As Admiral acknowledges, these are issues for another day. *See Medical Assurance Co., Inc. v. Hellman*, 610 F.3d 371, 375 (7th Cir. 2010) (duty-to-indemnify declaratory claims are not ripe "until liability has been established"); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1221 (Ill. 1992) (duty to indemnify "will not be defined until the adjudication of the very action which the indemnitor should have defended.") (citation and alteration omitted). But the possibility that discovery and trial may establish that defendants are liable for losses that are excluded by the policy does not stand in the

23

way of summary judgment on the threshold issue of Admiral's duty to defend. The question raised by the motion for summary judgment on this issue is whether Admiral has pointed to evidence suggesting that all claims in the underlying action are barred by the Expected or Intended Injury exclusion or the Assault and/or Battery exclusion. It has not.

Count VI: "Other Insurance"

Admiral's final declaratory claim asserts that it has no duty to defend or indemnify any defendant covered by other valid insurance that applies to the underlying suit. Liberty Mutual challenges this theory in its counterclaims, where it alleges not only that Admiral has a duty to defend defendants, it has the *sole* duty to defend them and owes Liberty Mutual equitable subrogation for defense costs it has already incurred. Liberty Mutual seeks resolution of all of these claims and counterclaims in its Rule 12(c) motion. Madlock-Henderson and Thompson Greenwell seek summary judgment in their favor on Count VI of Admiral's complaint.

It is helpful at this stage to recall the features of the two general types of insurance policies: "primary" and "excess." The most salient distinction for present purposes is that only the primary insurer has the duty to defend its insured. *Royal Ins. Co. v. Process Design Assoc., Inc*., 582 N.E.2d 1234 (Ill. App. Ct. 1991); *Liberty Mut. Ins. Co. v. Am. Home Assurance Co*., 348 F.

24

Supp. 2d 940 (N.D. Ill. 2004) ("the primary insurer, not the excess carrier, has the duty to defend its insured"). "Rather than providing a duty to defend, most excess policies require the excess insurer to indemnify the insured for the costs of the defense as part of the "ultimate net loss" against which the policy insures." *Id.*

The Admiral Policy's "Other Insurance" provision reads as follows:

1. This insurance is primary with respect to homeowners insurance maintained by a volunteer, employee, director or officer who is judged by us to have had no direct involvement in the covered loss.

2. This insurance is excess over all other valid and collectible insurance available to the insured for a loss we cover under this policy.

3. We will have no duty under this insurance to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

Compl. Exh. B at Form AD 06 54 01 03. Liberty Mutual's policy also contains an "Other Insurance" clause for personal liability, which provides:

This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

LM Mot. Exh. D at 15.[3]

When confronted with dueling "other insurance" provisions in policies that potentially cover the same risk, courts attempt to reconcile the clauses to effectuate the intent of the parties and determine the order of coverage. *Putnam v. New Amsterdam Cas. Co.*, 269 N.E.2d 97, 100 (1970). If the provisions are incompatible and there is no rational basis for giving effect to one provision but not the other, courts give effect to neither. *Id*. Here, the parties do not contend that their respective provisions are incompatible, but they disagree as to how they should be reconciled.

One conclusion that emerges clearly from the face of the respective provisions is that Liberty Mutual is not a primary insurer with respect to the claims in the underlying action. The terms of the Liberty Mutual policy on this issue are unambiguous: the policy is excess over other "valid and collectible" insurance—and, as Madlock-Henderson and Thompson Greenwell argue without contradiction, the Admiral Policy satisfies this criterion —*unless* the other insurance "is written specifically to cover as excess over the limits of liability that apply in this policy"— which the Admiral Policy plainly (and undisputedly) is not. Accordingly,

---

[3] Materials filed in support of Madlock-Henderson and Thompson Greenwell's joint summary judgment motion reveal that the "Other Insurance" provisions of the homeowner policy issued by State Farm to Thompson Greenwell is identical to the provisions in the Liberty Mutual policy.

whatever the Admiral Policy provides with respect to the order of coverage, Admiral's argument that "[s]ince the two homeowners policies are primary," it has "no duty to defend until those policies are exhausted" is erroneous. Omnibus Mem. at 20.

Nor is the conclusion that the Liberty Mutual policy is excess incompatible with Admiral's other insurance provisions. The third paragraph of Admiral's provisions, which provides that Admiral has no duty to defend any suit that another insurer has a duty to defend, is not implicated here because as an excess insurer, Liberty Mutual has no duty to defend.

The first paragraph of Admiral's other insurance provisions is trickier to interpret. Unlike the Liberty Mutual Policy, the Admiral Policy acknowledges that is primary in some circumstances. Admiral argues, however, that the provision making the Admiral Policy primary over homeowner insurance does not apply because neither Madlock-Henderson nor Thompson Greenwell is a "volunteer, employee, director or officer who is judged by us to have had no direct involvement in the covered loss." The first basis for this argument —that there is no "covered loss" at all based on the allegations of the UC— is easily dispatched for reasons discussed in the preceding sections. Admiral's next arguments —that even assuming a covered loss, the pleadings do not allege that Madlock-Henderson or Thompson Greenwell were volunteers, employees,

27

directors, or officers of the sorority, or that Madlock-Henderson "maintained" the homeowners policy issued to her husband— are only slightly less flimsy. It is true that the underlying complaint does not attribute any of the specific titles above to the individual defendants. But its allegations that each was a sorority member acting as its agent leaves little room to doubt (and Admiral suggests no reason to doubt) that each fell into at least one of these categories. And given that the homeowner policy Liberty Mutual issued to Terence Henderson explicitly defines "you" to include the named insured's spouse if living in the same residence, there is nothing at all to Admiral's bald claim that Madlock-Henderson did not "maintain" homeowner's insurance.

Admiral's final argument —that even assuming a covered loss, neither Madlock-Henderson nor Thompson Greenwell was "judged by us to have had no direct involvement in a covered loss"— requires closer scrutiny. To begin, although Admiral suggests that defendants bear the burden of proving that this provision establishes the primacy of Admiral's policy, because Admiral invokes the provision as an affirmative basis for disclaiming defense duties it otherwise owes, the burden appropriately lies with Admiral. Admiral argues that the individual defendants were not "judged by [Admiral] to have had no direct involvement in the covered loss." At this stage, however, Admiral is confined to the

allegations in the underlying complaint, which, quite naturally, say nothing at all about any "judgment" Admiral may have made about these defendants' role in any covered loss. Indeed, as discussed above, the allegations do not attribute specific conduct to any of the individual defendants, belying Admiral's insistence that it would be "impossible" for Admiral to have judged that these two had "no direct involvement."

Moreover, the meaning of the phrase "judged by us to have had no direct involvement in the covered loss" is not clear from the face of the Admiral Policy. And in fact, the parties' dispute over whether "judged by us" refers to Admiral's assessment of a particular defendant's role in a loss that is ultimately determined to be covered or to some other determination Admiral may make based on the pleadings and/or evidence prior to any adjudication, is genuine. Because the meaning of this phrase is ambiguous, it must be construed strictly against Admiral and in favor of coverage, which in this context, means that the Admiral Policy is primary over Madlock-Henderson's and Thompson Greenwell's homeowners policies, and that Admiral must bear the cost of their defense.[4]

---

[4] The second paragraph of Admiral's other insurance provision is inapplicable here, as the other policies at issue are "homeowners" policies covered by the first paragraph, not "other" policies covered by the second.

This brings me to the final issue raised by the parties' motions, which is Liberty Mutual's claims for equitable subrogation or equitable contribution. My conclusion that the Liberty Mutual Policy is excess and the Admiral Policy primary with respect to losses stemming from the underlying action leads inexorably to the conclusion that Liberty Mutual has no claim for equitable contribution. *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 277 ("an excess insurer cannot seek equitable contribution from a primary insurer") (citation omitted). Accordingly, I consider only Liberty Mutual's claim for equitable subrogation.

To win judgment on this claim, Liberty Mutual must show that: (1) Admiral is primarily liable to the insured for a loss under a policy of insurance; (2) Liberty Mutual is secondarily liable to the insured for the same loss under its policy; and (3) Liberty Mutual has discharged its liability to the insured and at the same time extinguished Admiral's liability. *See Old Republic Gen. Ins. Co. v. Amerisure Ins. Co.*, 2020 U.S. Dist. LEXIS 248710, *9 (N.D. Ill. Sept. 8, 2020) (citing *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 276 (Ill. 2004)). This claim is not susceptible to resolution at this stage. As the reference to "extinguish[ing]" liability in the third element suggests, an equitable subrogation claim "looks retrospectively at the loss suffered." *Home Ins. Co.*,

821 N.E.2d at 281. While Liberty Mutual will ultimately be entitled to recover from Admiral the costs of Madlock-Henderson's defense, which Admiral owed but Liberty Mutual paid, its equitable subrogation claim must await a determination of the "loss suffered."

IV.

For the foregoing reasons, Liberty Mutual's motion for judgment on the pleadings is granted as to Admiral's duty to defend defendants in the underlying action and as to Liberty Mutual's claim that the Admiral Policy is primary and the Liberty Mutual Policy excess as to losses stemming from that action. Liberty Mutual's motion is denied with respect to its claim for equitable contribution and denied without prejudice as to its claim for equitable subrogation. Admiral's motion for judgment on the pleadings is denied. Valdez's motion for judgment on the pleadings is granted. Madlock-Henderson and Thompson Greenwell's motion for summary judgment is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 29, 2021